May it please the Court, Alice Campos Mercado together with Paul Ray and Chris Jensen appearing for Regatta Bay Limited. Mr. Rosales, General Partner, is also here present in the courtroom. I'd like to begin by letting the Court know what this case is not about. This is not a case about a deadbeat owner with self-interest who was trying to skim distributions or skim money off of the property. The record reflects that this owner was generally in compliance with both the regulatory agreement and with HUD regulations. There was an audit to that effect, and the audit is in the record, where the auditors were asked by HUD to come in to see if this owner had been in compliance with the regulatory agreement and with HUD regulations. And that was in 1993 that the auditor, the Inspector General, found that he was. In addition to that, the chief of the multifamily housing asset in Las Vegas had determined in 1997 that there was a good working relationship between Mr. Rosequist and HUD. And then during the time that Regatta was trying to refinance this property, the bank, Riley Mortgage, had called him a good owner who kept in the spirit of the regulatory agreement and that he acted for the benefit of the property. Now, I bring those issues to bear because it's important for this Court to know that HUD was aware of all of those facts, and notwithstanding, they took the next level. They took the – they disregarded those findings and went ahead and said, we are going to charge him with a default of the regulatory agreement based on him making diversions from the property, which was absolutely incorrect. And then not only did they take that, they took it back to 1995. So when they sent him a letter on March 24, 2000, saying you're in breach of the regulatory agreement, you're in breach because you've encumbered the property and you've taken distributions, they knew all of that was incorrect. It wasn't correct because they themselves had determined that maybe these repayments were not disbursements as defined by the regulatory agreement. And they knew that they had issues with regard to trying to go back to 1995 to try to collect some of this money. Many of the funds that they were – that HUD was trying to reclaim were funds that had already been approved by HUD. In fact, in the audit, there's a $40,000 withdrawal that the auditor brings to bear and says, well, wait a minute, Mr. Ewing from HUD says we gave oral approval. All of those things were disregarded. So when we bring those in, we go to what this case really is about. It is a case about bad faith by the government to try to take this property from Regatta Bay for no good reason. Bad faith has been defined by Nevada law as implementing an attitude that transcends the circumference of authority, an act that has no relation to the prerogatives of the government. That's what was going on here. And that's where we began. This Court has said in a different context that bad faith evinces hostility towards an individual or to a class of citizens. And as we see what is happening, in Volume II of the excerpts, we show the evidence that indicates that HUD was on a mission to try to take this property. If you look at the first part of the 2000, February of 2000, before they send this letter out, there are memos that are going back and forth as they're trying to formulate this letter, and they themselves question whether or not these disbursements or the withdrawals or repayments are disbursements. They take it from their repayments of advances, and the record is replete with Mr. Rosequist saying those are repayments that are allowed by the regulatory agreement. They are allowed because I have to advance money to the property in order for the property to continue to survive. And because they're for reasonable expenses, then they're not disbursements as defined by the regulatory agreement. Don't we have a little problem, though? Did HUD say don't make any reimbursements over $10,000 without? Without prior HUD approval. Prior HUD approval. And they had, and he was in. Is that a fact? That is fact, Your Honor. Did he make disbursements over $10,000 without HUD approval? On occasion he did, and the reason that he did. After having been warned by HUD that he shouldn't do it. He had been told by HUD not to do it. And don't you, doesn't that pose a problem when we look to review? Let's assume whatever the motive is. Let's assume somebody wants to do whatever you say they want to do. They've got to have a legal basis to do it. Let's assume that further. Okay. And if they do, what does the Court do? Your Honor, what the Court looks at is the course of dealing that has been going on with this property. HUD recognized that without the advances, this property would not survive. In fact, they admitted that without Mr. Rosequist making these advances, this property would go into default. There's a letter by Mr. Rosequist in the file that says they told me that and I could either comply with that or go into default and lose the property, and I have to protect the property. I mean, that is the goal. And if you look at HUD's regulations, if you look at HUD's manual, the whole purpose of this process is to try to preserve the property, to try to protect HUD from having to pay the lender. Which claim are you just, is this argument going towards? The breach of the, tortious breach of the implied covenant of good faith and fair dealing, Your Honor. It's not the tortious interference? No, the tortious interference claim is gone. And so what we're looking at here. So you're talking about what? The special relationship they had? The special relationship would address the tortious breach of the implied covenant of good faith and fair dealing. And so what we're seeing here are. The only way that you're before us now is under the FTCA, is that right? Because your contract claims are gone. Those were all litigated in, before the claims court. That's correct, Your Honor. And so Judge Proe decided that the tort claim had to go as well, based on the absence of proximate cause and the absence of a special relationship. And we submit that those are both erroneous. Tell us about the special relationship. The special relationship, Your Honor, goes as we look at the HUD booklet. That's attached as an appendix to our opening brief. And throughout that booklet, there are references constantly to a relationship, an interdependent relationship among the mortgager and HUD and the managing agent. And so throughout there, you see the different relationships and the responsibilities that HUD has to the owner. Those are typical. There's nothing atypical about that. That's correct. That's just an ordinary surety relationship. Well, it's not an ordinary surety relationship. And the reason that it's not is because HUD has so much more control than any surety relationship would ever have. They're able to control finances. They're able to control the management of the property, which a surety would never have. And obviously, the most important aspect of it is that it's the government that we're talking about that has a great deal of authority and power. Is there anything in Nevada law that says the governments get treated differently under this tort? No. Okay. If that's the case, then aren't you holding HUD to a standard that no other private entity would be held to under Nevada tort law? No. Because under Nevada law, the government can be held responsible for bad faith, not simply because it's the government, but because as with other special relationships, there is a special element of reliance. And that's what brings to bear. If we go to the Ponzi scheme. Right. But if you're going to tell me that the government is special because it's the government, then that takes it out of the realm of private tort, which is what the FTCA is designed to address. That is, that the government must behave in the same way that private citizens in Nevada must behave. So, for example, if a Sergeant plows through a stop sign at Nellis, the Air Force will be held to the same standard as if it had been a private citizen someplace else in Las Vegas. And it's not simply because it's the government. It's looking at the elements of what constitutes tortious breach of the applied covenant of good faith. Special element reliance exists. It would exist whether it's the government or a private citizen. Yes, the government is held to the same standard, but it's that special element of reliance and also that superior power that it has. And that would exist whether or not it's a private citizen or the government. And, yes, and I understand that. But if I understand what I read in the briefs, this wasn't the government dealing with some uneducated poor person who was there on their last dime representing the... Your client was a very highly trained executive who knew exactly what he was doing against the government, which sometimes aren't as highly trained. Doesn't there have to be some change? And before you can say that your claim has been met, that there is something unequal. Now, the government's big, but when it gets down to push against shove, it's two people negotiating over a contract. And as I understand the record, on your side you had someone who was very well educated and a good businessman. Yes, Your Honor. Ms. Rothquist is those things. However, we do have the superior versus inferior because the government brings to bear a lot more than simply negotiating. This was not a negotiated contract. If you go that route, you're saying that every time the government is involved, it automatically is unfair. And I'm not sure you can say that. I thought you said that the government's to be treated like everybody else. Under the Tort Claims Act, that's exactly right. But you're still looking at the government as a party, and it's a party that has superior power. And that's what the Court is looking at, is superior versus the inferior, the weaker party versus the stronger party. So, but in every instance, the government is bigger than the party. In every instance. There wouldn't be an instance, under your theory, that the special relationship wouldn't occur. But not just bigger, Your Honor. More powerful. And as you look at some of the issues that are addressing here. I would say the government's always more powerful. It's a huge thing. They're trying to cut it back, I understand, but it just grows. And so there would never be a case in which the government and any person, even if the person were running Microsoft, the government's always bigger. So there would always be a special relationship. And I'm not sure that cases take you that far. I think the other issue there is that we're not talking about two parties who are negotiating. We're not talking about an arm's-length transaction. The regulatory agreement is an adhesion contract. There's no negotiation going on within the regulatory agreement. And so it's a take it or leave it, and that's one of the issues. That's right. It's a take it or leave it. Right. But the question is, was it unequal that between the two parties? And there's nothing in the record that indicates that the person representing your client was anywhere inferior in mental ability or otherwise than the person representing the government. Isn't that what we look at? Or is it always because the government is so big, automatically there's a special relationship? I think what you look at in that instance is whether there is an arm's-length transaction. And you don't have that here because you have a contract of adhesion. You never have. You never have with the government. Exactly. Which is why the government would not be exempt from a special relationship in an instance where it has determined that I am going to control what you do, I'm going to control the manufacturing property. Doesn't that mean, then, that the government would always be subject to the special relationship? It depends on the circumstances, and that's what PONSOC teaches us. It's a case-by-case basis. But how – but given the criteria that you've – that you've just laid out for us, wouldn't the government always be subject to that special relationship duty? Well, one of the things that we look at, Your Honor, is an adhesion contract. And not every relationship with the government involves an adhesion contract. But every one of them would use this standard contract that's at – that is at issue here would be a contract of adhesion under your criteria, wouldn't it? That would be an adhesion contract. So then the other elements that we look at is the special element of reliance. And that is what something – as you look at HUD, HUD says we're going to abide by this handbook, you're going to abide by this handbook. And so there's that special element of reliance, which is another factor in the whole issue of whether or not there's a special relationship. And, Your Honor, I can see my time is ticking away, if I may reserve. Before you – I'm going to ask our presiding authority to give you some extra time because there's another question I want to ask you. Okay. That has to do with proximate cause. It strikes me that the even stronger case, stronger argument that the government is going to make against you is on the proximate cause. And I'd like to hear your view of how you get around the proximate cause issue. Your Honor, if you look at the brief that the government submitted, one of the things they say is we have to show something that indicates that the default happened, the foreclosure happened for something other than nonpayment. What we are suggesting here and what we've told the Court is that you have to go back to the facts that happened before the nonpayment default happened. The only reason that payment was not made was because there had been a wrongful declaration of the regulatory agreement. He didn't pay it. But when he tried to pay it, and this is also in the record, he was ignored. He made the June payment. And so really this foreclosure happened out of the July payment. But the record also reflects that Mr. Rosquiz had submitted a payment, an extra payment, and they sent it back. It also shows that he contacted them and says, how do I cure? And they ignored him. They said, tell him to put it in writing, because they were bent on trying to take the property. So we go with the issue of predominant proximate cause. What were the facts or the events that set in motion the events, the chain of events that led to the foreclosure? He would not have defaulted had they not declared a regulatory agreement default, and they had no basis for declaring a regulatory agreement default. So that's how we go back to see what were the events that set the chain in motion that caused Mr. Rosquiz not to pay. Okay. Thank you very much. I'm going to give you a minute for rebuttal. Thank you. May it please the Court and counsel, I'm Roger Wenthy representing the United States. In order to survive summary judgment, Regatta needed to raise a genuine issue of fact on each and every element of its causes of action. They have spent most of their time trying to demonstrate there was an issue of fact on the element of good faith or bad faith, and we concede that there is an issue of fact on good faith or bad faith. We feel we would prevail if that issue were tried, but nonetheless, they've of their causes of action on which there are no issues of fact, a special relationship and proximate cause. And it is the failure of those elements that caused them to lose in the district court. On the special relationship, as Judge Wallace was pointing out, this was an arm's length transaction between sophisticated commercial parties. HUD took on the role of being the guarantor of Regatta's obligations. If Regatta were to default, HUD had to pay the loan off, and that's what happened in this instance. That's a surety-guarantor relationship, as we see here. That's the closest analog among state law, and Nevada Supreme Court has told us twice that relationship is not a special relationship under the law. You look for something much different than what you have here. You look for a disparity in bargaining power that is so vast that one of the parties simply is incapable of holding its own with the other, and the other party is capable of overbearing. Is that how the Nevada courts define it? Typically, yes. I mean, you look at the relationships they've held to be special. It's a long-term employee and an employer. It's a liability insurer, which is not the situation we have here. Liability insurers are kind of a special case because the insured depends on the liability insurer to defend them when they get sued. And not only that, but then you also have the innocent victim who's going to get paid by that liability insurance. And I think that's part of the reason the courts look at that as a special relationship that requires more than the normal amount of good faith, and a tortious duty can arise there. We don't have that here. We have a loan agreement and a regulatory agreement that were entered into by this party for a 120-unit commercial apartment complex that, you know, was a $3.6 million loan. This is, in fact, not a contract of adhesion in the sense that the law looks at it. It may have been a take-it-or-leave-it contract, but it's not a contract for an automobile or food or housing or something that an individual needs to live. Is the determination of a special relationship a finding of fact, or is it a conclusion of law? When the facts are undisputed, we believe it's a conclusion of law. We don't think the facts are disputed here. The contract between HUD and Regatta is in the record. And that's all – I think that's the only relevant fact that's needed, according to the Nevada Supreme Court. It's what is your contractual relationship with one another. And here it's surety guarantor and assured. Counsel makes an argument of looking at a more reality take of what is occurring. The government is always bigger. The government always has the resources. The government gets to make the regulations that they have to follow. I assume there was no discussion between the parties of whether we'll change the regulations or not apply the regulations. The people in Washington, D.C. would fire them immediately. So what do you say to her argument that the very nature of the situation is it's the big gorilla that's coming in? Well, HUD wears two hats, as we see it here. HUD is the surety guarantor. HUD has also got this regulatory agreement, which Regatta signed. And in that role, it's the regulator. And the reason it's the regulator is this is low-income housing. And HUD wants to be sure that if it's going to guarantee a loan, it wants to make sure that the people that are going to live in those apartments are going to have conditions that are acceptable and that they're not treated badly. And so as a regulator, certainly HUD has a lot of power and the ability to do many things, including control the rents. But we point out that that is not a fiduciary relationship. The relationship between a regulator and the regulated entity is more of an adversary relationship than a fiduciary one. HUD does not act in the interest of Regatta like a trustee would or an employer or a liability insurer would. HUD acts in the interest of its tenants to make sure that the public is getting good housing here. So we don't see that as creating. I'm sorry. What, if anything, is on the table for discussion in one of these things other than we'll sign the check or we won't sign the check? Well, that's obviously it's more of a decision on the part of the borrower, if you will, whether it wants to get into this kind of situation, whether it wants to be a provider of low-income housing. It comes into it knowing the whole panoply of things it's going to have to do. And I take it this particular fact situation has not been before the Nevada court or we wouldn't have this interesting discussion today? No. We're not aware of any case in any jurisdiction that requires a special relationship where this issue has come up and where it's decided. None of the states? None that we know of. Okay. I just wanted to get your view on that. But I assume that you have a stronger case on proximate cause? Well, and the point about proximate cause is that we feel that it's a little bit more difficult to establish proximate cause on these kinds of causes of action, breach of the duty, tortious breach of the duty of commercial good faith and fiduciary duty in this context, because the loss that occurred here would not have occurred had there not been a default by Regatta Bay. So a voluntary act of the victim falls in between the actions of HUD and the resulting loss. In most tort cases, you just have the tortfeasor setting in motion some kind of force that injures the victim. The victim doesn't really participate in any way. The victim is just injured. But here the victim is someone who actually failed to make a mortgage payment. And so to prove proximate cause in that situation, you have to prove that HUD somehow caused them not to make that payment. But their argument is that HUD was involved because they wouldn't accept the late payment. No. Well, that's the argument that I guess is being made now in the reply brief and here. That's not an issue that can be litigated here. That is one of the things that is foreclosed by the ruling of the Court of Federal Claims, because the things that were found in that court were, number one, there was a default. Number two, foreclosure was based on that default. And number three, foreclosure was proper based on that default. Those things are not open to be relitigated here. And so that discussion has to be disregarded. Is that what Judge Prowell held below? Yes, he did. Because the two counts that are not being argued up here, the first and fourth, were in fact failed because Judge Prowell held that they were barred by issue preclusion because of what the Court of Federal Claims had found. And again, to try to sneak that issue of, well, we didn't really default back into this, is an attempt to get around issue preclusion. They did default. And that's what Judge Prowell held. He didn't hold that. I'm not sure what his holding was as to counts 2 and 3. I'm not either. I think the point is that they weren't trying to argue in the district court, no, no, we didn't default as a basis for counts 2 and 3. But clearly that cannot be a basis here. So my point is that we believe that to establish proximate cause in this kind of situation you would need something very strong in the nature of duress or coercion to have caused them to default. All they allege and have brought evidence to show is just that the government accused them of wrongdoing, even threatened them. But accusing and threatening just don't deprive someone of their free will. They've never, ever explained why they didn't make their payments under this mortgage. And without that evidence, they don't have proximate cause. What is it – what comes into play, as you understand it, from the statement made by your adversary, that they said, put it in writing, and then they delayed it, and then they just went ahead and defaulted. How does that work into the proximate cause analysis? I don't think it has any relationship. The facts, again, as established in the Court of Federal Claims, were the June 2000 payment was due on June 1st, 2000. It wasn't made. The grace period ends on July 1, 2000. It wasn't made by that date. So they were in default. There is no question about those facts. They didn't make that June 1st payment until July 31st. Between July 1st and July 31st, the government HUD went to the servicer, Riley, and said, declare them in default. Riley declared them in default, and all the events then followed from that. But your position is that that doesn't come before us because of issue preclusion. That's exactly right, that that's already been decided. But to the extent the Court wants to know what the facts are, those are the facts, and they're not contested. They can't be contested. I did want to address just very briefly the case that was mentioned in the 28J letter that was filed by Regatta. It really has no application here. It is a case involving the question of whether a first-party insurance policy covered a loss. It's an all-risk policy, as it's known, and it covers the insured for loss to its own property. And there are occasions where events which led to the loss, some of them, some of the events contributing to the loss are covered by the policy, and some of the events contributing to the loss are not covered by the policy. And what happens in that situation? And there is a doctrine called efficient proximate cause that is used to decide whether the policy covers that loss or not. This is no relationship to this case whatsoever. There's no policy of all-risk insurance involved here. If the Court has no other questions. Thank you, counsel. Thank you. Mr. Acaba, we've given you another minute. Thank you, Your Honor. On the issue of proximate cause, let me first say that that is an issue of fact that should be decided by a fact finder. Secondly, there is not an issue of issue preclusion with regard to the events that led to the nonpayment. The Court of Federal Claims dealt with the nonpayment and the foreclosure. But the events that preceded that, that caused the nonpayment, those were not before the Court of Federal Claims. Those are the things that predominate the proximate cause. That was the basis of our letter with the case. And the reason we submitted it is that the Nevada Supreme Court had just adopted the efficient proximate cause, but it had been in effect, obviously, in other locations. But it certainly applies with regard to the predominating cause. What set the facts in motion that led to the nonpayment? Don't you have a little tough problem here, though? We look to see were the parties notified? Did everybody know what the rules of the game were? And was there default? And was the default cued? And when you look at the record, you say, yes, there was a default. No, the default was not cued. But the rules of the game changed depending on what HUD wanted to do, because sometimes they said you can withdraw money if you do it under $10,000. Sometimes they said we're going to approve it verbally. You don't need it in writing. The rules of the record they notified, don't write a check over $10,000 without prior approval from HUD. Isn't that a fact? That is a fact, Your Honor, but it isn't. Isn't there a fact that withdrawals of $10,000 were made without HUD? But that's not the reason for the default. No, that's not the reason, but that's a background. And the payment was due and it wasn't made. There was a period of time in which default could have been cured. It wasn't cured. But the only reason it wasn't cured is because HUD would not let it be cured. And that's what I'm saying, is that the whole basis behind it. Being HUD would not let it be cured. Did they send the money? He sent the money. They sent the check back, $30,000. Sure. But doesn't timing enter into the equation? And it has entered into the equation in the 17 years that this man has owned this property, and each time they've worked with Riley Mortgage. Riley Mortgage, the lender, they called him a good owner, a good borrower. They were working with him because he was trying to preserve the property. It wasn't a matter of him not making payments because he didn't want to make the payments. A lot of the times that he couldn't make the payments is because. Oh, but don't you see what I'm asking you? We're looking in review. I understand. And when we look to review, what I think you are making are equitable arguments that ought to get on the scale. But when we look, don't we look to see just what I said? Was there notice? Was there default? And was it cured within the time limits? But in doing a de novo review, which you're doing in this case in summary judgment, you're looking at all of the facts and circumstances that led to the ultimate. The issue that Mr. Wentley made is they haven't shown that he didn't default because of something we did. Yeah, I think we did. And I think those are issues of fact that go directly to that point, is he only didn't pay because HUD put the hurdle in his way, that $1.3 million demand that should have been paid, they say that is a repayment considered a distribution, and that's a 2ER-254. It wasn't considered a distribution. It was never a distribution. Yet they declared a regulatory agreement violation. And by doing that, they tied his hands and he could no longer pay it. So he didn't pay it, not because he was a deadbeat, not because he wanted to take money. He just didn't pay it because HUD put the hurdle in his place. And I see that I'm way over my time, and I apologize. Thank you. Thank you. Thank both counsel for the argument. Case is submitted.
judges: Wallace, Farris, Bybee